UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONIN PRENG BELESHI,

Plaintiff,

v.

ERIC H. HOLDER, JR., ET AL.,

Defendants.

Case No. 12-11681
Honorable Julian Abele Cook, Jr.

ORDER

The Plaintiff, Tonin Preng Beleshi ("Beleshi"), filed this action pursuant to 8 U.S.C. §1421(c), seeking a *de novo* review of the United States Citizenship and Immigration Services' ("USCIS") decision to deny his application for naturalization. Currently before the Court is the Government's motion for summary judgment, arguing that Beleshi is ineligible for naturalization because he (1) has never lawfully obtained permanent resident status, and (2) is unable to establish good moral character.

Having reviewed the parties' briefs, the accompanying exhibits, and the record as a whole, the Court finds that (1) the pertinent facts and legal contentions are sufficiently presented in these materials, and (2) an oral argument would not be of any assistance in the resolution of this matter.

I.

Beleshi, a citizen and native of Albania, entered the United States in December of 1994 on a B-1 nonimmigrant visa. (Def.'s Ex. A, Biographic Information sheet). Shortly thereafter, he submitted an application for asylum on May 10, 1995 to the Immigration and Naturalization Service

("INS"), the predecessor agency to the USCIS. (Def's Ex. B, Application for Asylum, May 10, 1995). In his application, Beleshi indicated that he was single. Approximately two months later, in two separate submissions to the INS, Beleshi affirmed that his marital status remained unchanged. (Def's Ex. C, Biographic Information, March 20, 1996); (Ex. D, Second Application for Asylum, March 20, 1996).

Notwithstanding Beleshi's prior representations concerning his marital status, in February 1998, he filed a refugee/asylee petition on behalf of his spouse, "Beleshi (Leka)"[1]- a woman he claimed he married on September 10, 1994. Beleshi further maintained that she was born on August 16, 1973. According to the "official" records submitted by Beleshi in support of this petition, however, his wife,"Mimoza Beleshi," was actually born on August 19, 1976. (Def's Ex. F, Official Records). Thus, it appears from a casual reading of the two documents that were submitted on behalf of Mimoza that her petition revealed at least two ostensible misrepresentations; namely, (1) Beleshi was, in fact, married when he filed his first application for asylum, and (2) a disconnect between the date claimed by Beleshi to be the birth date of his wife; namely, August 16, 1973, and her birth date on file with the Albanian authorities; i.e., August 19, 1976. Beleshi's various requests for immigration benefits on behalf of his "wife" were initially approved. (Def's Ex. I, Notice of Approval of I-730, May 28, 1999). However, on May 16, 2000, when Mimoza appeared for a scheduled interview at the consular office, authorities were alerted to the discrepancies in the names, birth dates, and marriage documents that had been submitted in support of her application. Indeed, a letter from the INS to Beleshi dated March 7, 2002 reads as follows:

[1] Lacking any evidence to the contrary, the Court assumes that "Leka" was Mimoza's maiden name.

> The [INS] received a Memorandum dated June 19, 2002 from the Embassy in Tirana, Albania, with discrepancies in documentation. The approved petition lists the name Mimoza Beleshi (Leka) as the wife of the petitioner, Tonin Beleshi, while the passport presented by the applicant at the time of interview . . . has the name Vjollca Beleshi. On the approved petition, Mimoza Belshi's [sic] birthdate is listed August 16, 1973 while the passport of Vjollca Beleshi lists a birthdate of March 19, 1976.

(Def's Ex. J, Letter, March 7, 2002). Interestingly, on March 2, 2002 - while Mimoza's petition was still pending - Beleshi married a woman by the name of Christy Ann Beleshi. (Def's Ex. M, Application for Naturalization, Oct. 24, 2010). Shortly thereafter, the INS, citing to Beleshi's failure to respond to the accusations of document fraud, issued a final denial of Mimoza's application. (Def's Ex. L, Final Denial, August 13, 2002).

Beleshi's evasiveness continued in subsequent submissions to the INS. On December 31, 2003, Beleshi signed, under penalty of perjury, an "application to register permanent residence or adjust status." (Def's Ex. O, Form I-485, December 31, 2003). Beleshi reported that he had been granted asylum and was eligible for adjustment of status. *Id.* However, Beleshi was not truthful when answering questions regarding his past legal contacts with law enforcement agencies. Indeed, he indicated that he had never "knowingly been arrested, cited, charged, indicted, fined or imprisoned for breaking any law or ordinance . . . ." or "knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S." *Id.* According to court records, however, Beleshi was arrested just four months earlier for domestic assault and battery. (Def's Ex. N, Court Records, August 11, 2003). As it turns out, he was also arrested four other times following his initial application; once in 2005 for dog abuse, and again in 2007 and twice in 2009 - all for domestic assault and battery. *See* (Def's Ex. M, Q, R, S). With respect to one of the domestic assault incidents, Beleshi's wife alleged that he had "struck her in the face region . . . grabbed her ear and twisted and

pinched her nose really hard." *(Id.* at Ex. R). Beleshi pled no contest to this particular offense and, according to the police report, was sentenced to 12 months of probation. *Id.* Notwithstanding these glaring misrepresentations, Beleshi's application was ultimately approved, rendering him a permanent resident of the United States as of January 27, 2004. (Def's Ex. P, Permanent Residence Memo)

On October 24, 2010, Beleshi filed his application for naturalization. (Def's Ex. M.) Once again, he made several misrepresentations relating to his marital status and criminal history. Indeed, despite his alleged marriages to Mimoza and Christy, Beleshi indicated that, as of 2010, he had only been married once. Moreover, in the section titled "Good Moral Character", Beleshi checked both the "yes" and the "no" boxes when asked if he had ever "been arrested, cited or detained by any law enforcement officer . . . for any reason." Finally, in the section which required him to provide specific details about his past criminal activity, he listed only two of his five prior arrests. *Id.*

During a required follow-up interview concerning his application for naturalization, Beleshi conceded that he had been arrested on "three" occasions, but failed to provide the "year of arrest or disposition for the final incident . . . .", and opted not to disclose any of his other arrests. (Bynum Decl ¶16, Sept. 30, 2013). Beleshi likewise affirmed that he had been married only once and denied "ever giv[ing] false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal." (*Id.* at ¶29). In sum, Beleshi continued to distort the truth up to and through the very end of the naturalization process.

On June 26, 2011, the USCIS denied Beleshi's naturalization application for failure to prosecute, which in turn prevented him for carrying his burden of establishing good moral character. The USCIS offered the following explanation:

> You appeared for an interview on this application on March 23, 2011. At the interview you failed to provide proof that you are an individual of good moral character. You were given 30 days to provide this information. The officer requested certified copies of arrest records/police reports (relating to any and all arrests), court dispositions (relating to any and all arrests), and evidence that any sentence has been completed and all fines and fees have been paid in full.
>
> You failed to provide a certified court disposition for your 2005 arrest for [d]og [a]buse. You also failed to provide the certified police report for your August 11, 2003 arrest for [a]ssault and [b]attery ([d]omestic), your April 15, 2006 arrest for [a]ssault and [b]attery-[d]omestic, your November 7, 2009 arrest for [a]ssault and [b]attery ([d]omestic), and for your 2005 arrest for [d]og [a]buse.
>
> By failing to provide the documents that are required, you have prevented USCIS the ability to determine you [are] a person of good moral character.
>
> Accordingly, your application for naturalization is denied.

(Def's Ex. T, Denial Doc).

On July 11, 2011, Beleshi filed a timely request to appeal the USCIS' decision. At the hearing, he once again failed to submit certified police reports in connection with four of his arrests. (Def's Ex. U, Affirmation of Denial). On October 21, 2011, the USCIS affirmed the denial of Beleshi's application and sent him a written response to that effect. The USCIS explained that, once again, "based on the evidence in the record and your arrest history, it appears that you have failed to meet the good moral character requirement. You have failed to overcome the denial of the N-400 naturalization application." *Id.* Dissatisfied with this result, Beleshi filed the instant suit seeking a *de novo* review of the denial under 8 U.S.C. § 1421(c).

During Beleshi's deposition, he attempted to explain the apparent disparity surrounding his marital status. While the bulk of his testimony was difficult to comprehend, his explanation only

raises further doubt with respect to the veracity of his story. Indeed, notwithstanding the fact that he filed an asylum application on behalf of Mimoza - who later presented a passport bearing the name "Vjollca" - he was actually married to a woman by the name of "Gjustin Mertini." (Beleshi Aff. ¶3). When asked to explain the circumstances which caused him to submit applications and supporting documents to U.S. immigration authorities with names that differed from that of the woman whom he claimed to be his wife (i.e. Gjustin Mertini v. Vjollca Leka Beleshi v. Mimoza Beleshi), he responded with the following statement: "you can call [it] either way, you know, fraudulent . . . . " but "I didn't . . . manufacture any [of the official documents]" "that's what I was provided . . . and that's what I [provided] to you." (Def's Ex. W, Beleshi Dep at 61-62).

In essence, Beleshi denies that he ever intentionally misrepresented his marital status or the name of his wife, and appears to chalk up all of the discrepancies in his submissions to cultural differences between the United States and Albania. *See Id.* at 64. (Beleshi explaining "[W]hen I was in Albania, this is how the system work[s], and that's what I'm providing, system from my land, system to this land, and see how the operation go[es], that's how it work."). Finally, in his affidavit, Beleshi concedes "not admitting on my applications for adjustment of status and naturalization that I was arrested a number of times. Looking back on it I really have a hard time remembering exactly how I messed up those questions." (Beleshi Aff. ¶15).

Beleshi has not requested an evidentiary hearing, but instead argues that there are genuine issues of material fact with respect to those required elements entitling him to United States citizenship. The Government disagrees and has filed a motion for summary judgment, arguing that Beleshi (1) never lawfully obtained permanent resident status, and (2) is unable to establish good moral character.

II.

Beleshi filed his complaint in this matter after an immigration officer reviewed, and affirmed, the denial of his naturalization application. Accordingly, he is entitled to seek a judicial review of the reviewing officer's decision. 8 U.S.C. §1421(c). "Such review shall be *de novo*, and the court shall make its own findings of fact and conclusions of law and, shall at the request of the petitioner, conduct a hearing *de novo* on the application." *Id*. As the court observed in *Lucaj v. Dedvukaj,* 12-12790, 2014 WL 1304619, *10 (E.D. Mich. March 31, 2014), "[t]his grant of authority is unusual in scope – rarely does a district court review an agency decision *de novo* and make its own findings of fact." Moreover, the review by this Court "is not limited to any administrative record," and its decision "may be on facts established in and found by the district court *de novo*." *Id*. at 10 (quoting *Hassan v. Dedvukaj*, 09-10716 2010 WL 199931, *4 (E.D. Mich. Jan. 19, 2010)). Furthermore, "it is proper to conduct this [de novo] review," "within the context of a motion for summary judgment." *Id*. (citing *Hassan*, 2010 WL 199931 at 4).

The purpose of the summary judgment rule, as reflected by Federal Rules of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. V. Catrett*, 477 U.S. 317, 323-24 (1986). The entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)).

In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing a request for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or the absence of a genuinely disputed material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

III.

The general requirements of naturalization, as outlined at 8 U.S.C. §1427, require an applicant to, *inter alia*, reside continuously in the United States as a lawful permanent resident for at least five years before filing an application for naturalization. *See also* 8 U.S.C. §1429. A naturalization applicant's eligibility is also conditioned on a showing of "good moral character" at least "during all periods referred to in this subsection." 8 U.S.C. §1427(a)(3). The burden is on the applicant seeking naturalization to establish his or her eligibility. *Lucaj*, 2014 WL 1304619 at *11; *Berenyi v. Dist. Dir., I.N.S.*, 385 U.S. 630, 637 (1967). Because "the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship . . . it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect" and that doubts "should be resolved in favor of the United States and against the claimant." *Berenyi*, 385 U.S. at 637. "This burden requires the applicant to prove, by a preponderance of the evidence, that he or she meets all of the requirements for naturalization and is thus eligible to become a citizen of the United States." *Lucaj*, 2014 WL 1304619 at *11; *see* 8 C.F.R. §316.2(b).

As a preliminary matter, to establish eligibility for naturalization, the applicant has the initial burden of demonstrating that he or she was lawfully admitted to the United States for permanent residence. *See* 8 U.S.C §1429 (". . . no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Act. The burden of proof shall be upon such person . . . . "). The Immigration and Nationality Act ("INA") defines the phrase 'lawfully admitted for permanent residence' as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. §1101(a)(20); *Lucaj*, 2014 WL 1304619 at *11.

However, simply having legal permanent resident status is not enough to meet the applicant's burden; "[a]n alien who acquired permanent resident status through fraud or misrepresentation has never been 'lawfully admitted for permanent residence.'" *Id*. (quoting *In re Koloamatangi*, 23 I. & N. Dec. 548, 550 (BIA 2003). A number of circuits, relying on *Koloamatangi*, have held that to be "lawfully admitted" requires that the applicant have complied with both the procedural and substantive legal requirements in place at the time of admittance. *Lucaj*, 2014 WL 1304619 at *11; (citing *Matter of Longstaff*, 716 F.2d 1439 (5th. Cir. 1983) (Although the applicant enjoyed the official status of being a lawful permanent resident for over 15 years, the court held that he had not been "lawfully" admitted because he was later charged with conduct that was grounds for exclusion at the time he procured lawful permanent resident status).

According to the Government, even though Beleshi was technically a permanent resident, he did not obtain this status lawfully and is therefore ineligible to naturalize. More specifically, it is the Government's position that Beleshi made multiple fraudulent and willful misrepresentations on immigration documents submitted to the INS and UCIS.

Pursuant to 8 U.S.C. §1182(a)(6)(C)(i), an alien is ineligible for permanent resident status if he "by fraud or [through] willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation or admission into the United States or other [immigration] benefit . . . ." Although the term "fraud" is not defined in the INA, the Board of Immigration Appeals (BIA) has held that fraud "consist[s] of false representations of a material fact made with knowledge of its falsity and with the intent to deceive the other party." *Matter of G-G-*, 7 I. & N. Dec. 161, 164 (BIA 1956); *see also Parlak v. Holder*, 578, F.3d 457, 464 (6th Cir. 2009). Furthermore, in order "for a representation to constitute fraud, '[t]he representation must be believed

and acted upon by the party deceived to his disadvantage.'" *Ortiz-Bouchet v. U.S. Atty. Gen.*, 714 F.3d 1353, 1356 (11th Cir. 2013) (quoting *Matter of G-G-*, 7 I. & N. Dec. at 164).

Similarly, the BIA has defined "willful misrepresentation" in a virtually indistinguishable manner, with the exception that willful misrepresentation does not require proof "that the person to whom the misrepresentation was made was motivated to action because of the misrepresentation" and does not require an "intent to deceive." *Id*. at 1357 (quoting *Matter of Kai Hing Hui*, 15 I. & N. Dec. 288, 290 (BIA 1975)). As such, this circuit and the BIA have consistently evaluated fraud and misrepresentation separately. *Parlak*, 578 F.3d at 464 (the INS need only show that "the alien obtained a[n immigration benefit] by fraud *or* by willfully misrepresenting a material fact.").

Both fraud and willful misrepresentation require a "material" misrepresentation. A "misrepresentation is material . . . if it tends to shut off a line of inquiry which is relevant to the alien's eligibility, *and* which might well have resulted in a proper determination that he be excluded." *Matter of Ng*, 17 I. & N. Dec. 536, 537 (BIA 1980) (emphasis added). A concealment or misrepresentation is material if it "has a natural tendency to influence, or was capable of influencing, the decision of" the decision making body to which it was addressed. *Kungys v. U.S.*, 485 U.S. 759, 770. To establish that Beleshi's statements were "material," "the Government is not required to prove that the [applicant] would not have been granted a visa but for the misrepresentation." *U.S. v. Kalymon*, 541 F.3d 624, 635 (6th Cir. 2008).

Here, Beleshi obtained his lawful permanent resident ("LPR") status as an asylee on January 27, 2004. However, there is a plethora of evidence in the record supporting the Government's conclusion that Beleshi's LPR status was obtained through fraud or willful misrepresentation. The first, and unarguably most obvious of Beleshi's misrepresentations, is found on his application for

LPR. Indeed, in response to the question of whether he had ever "been arrested, cited, indicted, fined, or imprisoned for breaking any law or ordinance excluding traffic violations", Beleshi answered "no", when, in fact, he had been arrested just four months earlier for assault and battery. *See* (Def's Exs. M and V). The Sixth Circuit, in *Corrado v. U.S.*, 227 F.2d 780, 784 (6th Cir. 1955), explained that "the issue is not whether naturalization would have been denied . . . had [the petitioner] revealed his numerous arrests, but whether, by his false answers, the Government was denied the opportunity of investigating the moral character of appellant and the facts relating to his eligibility for citizenship." Answering this question in the affirmative, the court ultimately upheld the decision to rescind the petitioner's naturalization certificate on the grounds that the omission of his prior arrests constituted "a material fact which, if revealed, might have prevented his acquisition of citizenship." *Id.*

The *Corrado* decision squarely addresses Beleshi's only argument on this score; namely, that there exists a genuine question of a material fact as to whether the prior arrest was essential to his application for permanent residence. Furthermore, as the Supreme Court pointed out in *Kungys*, "[s]ince it is the court's responsibility to interpret the substantive law . . . it is proper to treat the issue of materiality as a legal question." 485 U.S. at 773. Here, there is no question that (1) Beleshi failed to disclose at least one prior arrest, and (2) as a result, the Government was precluded from exploring a relevant line of inquiry. The significance of Beleshi's misrepresentation is amplified by evidence that the arrest in question occurred just four months prior to the submission of his application. In fact, Beleshi expresses his own misgivings about "not admitting on my applications for adjustment of status and naturalization that I was arrested a number of times. Looking back on it I really have a hard time remembering exactly how I messed up those questions." (Beleshi Aff.

¶15). Accordingly, the Court finds that substantial evidence has been presented showing that Beleshi's LPR status was obtained through misrepresentation. 8 U.S.C. §1182(a)(6)(C)(I). As such, the Court must, and does, grant the Government's motion for summary judgment on this basis.[2]

Even assuming, *arguendo*, that Beleshi was lawfully admitted, the record establishes that he cannot satisfy the "good moral character" requirement of 8 U.S.C. § 1427(a)(3). The law is clear that a " naturalization applicant bears the burden of establishing, by a preponderance of the evidence, that he has been, and continues to be, 'a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.'" *Lucaj*, 2014 WL 1304619 at *13 (internal citation omitted). In evaluating good moral character, the court is not "limited to the applicant's conduct during the five years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at the time prior to that period." 8 U.S.C. §1427(e).

An applicant is statutorily deemed to lack good moral character if he or she has, *inter alia*, given false testimony for the purpose of obtaining an immigration benefit. 8 U.S.C. §1101(f)(6); 8 CFR § 316.10(b)(1)(vi). Furthermore, unless extenuating circumstances exist, an applicant shall also be found to lack good moral character if the applicant "[c]ommitted unlawful acts that adversely reflect upon the applicant's moral character," even if the applicant was not convicted or imprisoned for such acts. 8 CFR § 316.10(b)(3)(iii). Although this "catch all" provision of the regulation does not define "unlawful acts," some courts have "interpreted [it] to mean 'bad acts that would rise to the level of criminality, regardless of whether a criminal prosecution was actually initiated." *Etape*

[2] The Court notes that, in light of its holding, it is unnecessary to address the Government's alternative LPR arguments.

*v. Napolitano*, 664 F. Supp. 2d 498, 507 (D. Md. 2009) (quoting *Meyersiek v. U.S. Citizenship & Immigration Servs.*, 445 F. Supp. 2d 202, 205 (D.R.I. 2006). Further, "extenuating circumstances" have been defined as those which must "pertain to [the applicant's] culpability to [the unlawful act], and its negative impact on his moral character." *U.S. v. Jean-Baptise*, 395 F.3d 1190, 1195 (11th Cir. 2005).

The Government argues first that Beleshi is statutorily barred from establishing good moral character because he provided false testimony during his interview with Officer Bynum. According to the Supreme Court, an applicant is prohibited from demonstrating the existence of good moral character where he (1) makes an oral statement under oath, that (2) includes misrepresentations "made with the subjective intent of obtaining immigration benefits." *Kungys*, 485 U.S. at 780. "[F]alse testimony is not rendered inconsequential due to its seemingly innocuous nature. Rather, any testimony given under oath that is false can be used to show that the petitioner lacked good moral character, no matter how trivial or inconsequential." *Lucaj*, 2014 WL 1304619, *14 (citing *Id.*).

A review of the documentary evidence in conjunction with Beleshi's testimony at various stages of the application process supports the Government's conclusion that Beleshi provided false testimony during his interview with Officer Bynum on March 23, 2011 in order to obtain an immigration benefit. As discussed above, the record reflects that Beleshi was arrested on at least five separate occasions. *See* (Def's Br. Ex. M, N, Q, R, S). Yet, when pressed by Officer Bynum about his arrest history, he admitted to only three arrests; "an arrest relating to a dog in 2005, an arrest for abuse in 2010, and an arrest for assault and battery." (Bynum Aff. ¶ 16). While it's unclear which of Beleshi's four arrests for assault and battery he opted to omit, "[b]y failing to disclose [all]

of his convictions, the petitioner gave false testimony to obtain an immigration benefit in violation of 8 U.S.C. § 1101(f)(6) and 8 C.F.R. § 316.10(b)(2)(vi)." *Keaik v. Dedvukay*, 557 F.Supp.2d 820, 829 (E.D. Mich. 2008) (finding that petitioner's failure to disclose all of his traffic offenses constituted lack of good moral character).

In addition to his arrest history, Beleshi's testimony presents even further inconsistencies. Indeed, he specifically denied ever helping "anyone enter or try to enter the United States illegally." (Bynum Aff. ¶ 28). This denial is directly contradicted by Beleshi's own admission that, notwithstanding his acknowledgment of having submitted immigration petitions on behalf of "Mimoza Beleshi", "Mimoza Leka Beleshi", and "Vjollca Leka Beleshi" - all of whom he represented to be his wife - he was never actually married to any of them. (Beleshi Dep, 63-64). In sum, Beleshi made blatant misrepresentations with respect to at least two different lines of questioning, both of which concerned life changing events - marriage and arrest. This type of conduct only "bolter[s] the conclusion of poor moral character premised on the petitioner's lack of candor . . . . " *Keaik*, 557 F.Supp.2d at 829.

Moreover, even assuming Beleshi's misrepresentations and false testimony were not serious enough to automatically imply bad moral character when judged by the "standards of the average citizen in his community of residence", 8 C.F.R. § 316.10(a)(2), he would still fail to qualify as a person of good moral character under the "catch-all" provision. 8 U.S.C. § 1101(f). Beleshi filed his application for naturalization on October 24, 2010. The five-year statutory period for establishing good moral character therefore began on October 24, 2005. During that time period, Beleshi was arrested on five separate occasions for dog abuse and domestic assault and battery. Moreover, as described in detail throughout this Opinion and Order, he (1) consistently misrepresented his marital

status and history, (2) submitted petitions for immigration benefits on behalf of women with whom he was not married, (3) failed to disclose the full extent of his criminal history on multiple occasions, and (4) lied under oath when asked to affirm certain aspects of his naturalization application. Despite being offered several opportunities to correct his prevarications, Beleshi continued to distort the truth in pursuit of his own self-interest.

Finally, the Court notes separately that, following Beleshi's initial interview with Officer Bynum, the USCIS formally requested him to produce a series of documents concerning his legal history. The record reflects that Beleshi failed to comply with this request by, *inter alia*, not turning over a certified police report in connection with his August 11, 2003 arrest. "The regulations explicitly state that failure to prosecute will be found where an applicant, without good cause being shown, 'fails to provide within a reasonable period of time such documents, information, or testimony deemed by the Service to be necessary to establish his or her eligibility for naturalization.'" *Keaik*, 557 F.Supp. at 829 (quoting 8 C.F.R. § 335.7). In light of Beleshi's background – and, more specifically, his relationship with immigration authorities, it stands to reason that the USCIS was unwilling to make a value judgment as to his moral character without this information. This, in conjunction with the *de novo* review of the record as whole by this Court, including substantial evidence which demonstrates that Beleshi's permanent resident status was obtained through fraud – all leads to the same conclusion; namely, that Beleshi has failed to carry his burden of establishing entitlement to naturalization. As such, the Court concurs with the USCIS' decision to deny his application.

IV.

For the reasons that have been set forth above, the Court grants the Government's motion for summary judgment (ECF No. 12). This Order closes the case in its entirety.

IT IS SO ORDERED.

Date: September 16, 2014

s/Julian Abele Cook, Jr.
JULIAN ABELE COOK, JR.
U.S. District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 16, 2014.

s/ Kay Doaks
Case Manager